**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ROBERT A. CLARK,

       Plaintiff,

vs.                                                 No. CIV 97-0517 BB/JHG

UNIVERSITY OF CALIFORNIA and
SIEGFRIED HECKER, in his individual
and official capacity,

       Defendants.

**MEMORANDUM OPINION**

This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 73), filed May 18, 1998. Having reviewed the submissions of the parties and the relevant law, the Court finds that Defendants' Motion should be DENIED.

**I. Facts, Procedural History, and Contentions of the Parties**

This is an employment discrimination case in which plaintiff Robert A. Clark, a former scientist at Los Alamos National Laboratory who was approximately 53 years old at the time of his termination, alleges he was laid off in a reduction in force ("RIF") in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§621 et seq., and the New Mexico Human Rights Act (NMHRA), N.M.S.A. 1978 §§28-1-1 et seq. Plaintiff originally named as

defendants the Regents of the University of California, who operate the Los Alamos Lab, and Siegfried Hecker, director of the Lab.  Defendant Hecker has been dismissed from the suit.

Los Alamos National Laboratory is operated by the Regents of the University of California under a contract with the U.S. Department of Energy.  In June 1995, Lab Director Siegfried Hecker announced that, due to looming budget cuts and in accordance with recommendations from the Energy Department, the Lab would conduct a RIF for the purposes of decreasing overhead and redundancy, and enhancing productivity and efficiency.  One goal of the RIF was to increase the ratio of technology and scientific personnel to support personnel.[1]

Approximately 200 people were terminated in the course of the 1995 RIF, among them Plaintiff Robert Clark, who was 53 years old at the time.[2]  Plaintiff had worked for 22 years at Los Alamos Lab as a physicist in the Applied Theoretical and Computational Physics Division, also known as X-Division.  His work involved the development of codes to predict and analyze the results of nuclear tests.[3]

Of 33 divisions or program directorates at the Lab, 22 participated in the RIF.  X-Division was one of the participants.  The decision as to which individuals would be terminated was made within each division.  Division directors ranked their employees in accordance with labwide RIF guidelines, but the weight to be accorded each selection criterion was determined separately by

---

[1] Exhibit A to Defendants' Memorandum, "The Inside Story," June 23, 1995; Exhibits 1-2 to Plaintiff's Response, "Talking Points," July 18, 1995.

[2] First Amended Complaint, ¶¶ 9-10.

[3] Plaintiff's Response, at 1; First Amended Complaint, ¶ 10.

each division according to that division's needs.[4]  The labwide RIF guidelines specified that employees were to be ranked within their divisions, based on four criteria: (1) demonstrated job performance; (2) experience and achievement; (3) skills, knowledge, and ability critical to the organization's objectives; and (4) transferability of skills and versatility.  Age was not to be used by the divisions as a criterion in deciding who would be laid off in the RIF.[5]

X-Division participated in the RIF voluntarily.  Its asserted reasons for doing so were to reduce costs and increase productivity by restructuring its workforce in order to respond to the "current and future mission objectives" of the division and "to becom[e] a more efficient, productive organization in terms of what we gave our customers for the money that they gave us as resources."[6] Plaintiff asserts that X-Division's participation in the RIF was unwarranted, since that particular division was not facing budget cuts, nor did the other reason put forth by the Lab as justification for the RIF — increasing the ratio of science and technology personnel to support staff — apply to X-Division.[7]  Plaintiff points to evidence that X-Division's participation in the RIF was instead motivated by a desire to create budget space and hire more postdocs (i.e., those who recently received their doctorates, nearly always younger than employees in Plaintiff's age group) as permanent employees.[8]

---

[4] Exhibit J to Defendants' Memorandum, Affidavit of Arthur Garcia, at 1-2.

[5] Exhibit B to Defendants' Memorandum, "RIF Guidelines."

[6]Exhibit C to Defendants' Memorandum, Memo Re: X-Division's Participation, at 1-2; Exhibit D to Defendants' Memorandum, Deposition of Rodney Schultz, at 29-30.

[7] Plaintiff's Response, at 5-6, and Exhibits 6-9 thereto.

[8] Plaintiff's Response, at 5-6, and Exhibits 11-13 thereto.

X-Division employed the following procedure for choosing which of its employees would be RIFed: Group leaders within the division evaluated employees within their groups according to the RIF criteria, rating and ranking each member. Following these initial rankings, the Group Leaders submitted to the division office the names of the four employees within their group who had ranked lowest. The X-Division Director, Deputy Director, and Group Leaders then met to discuss the ranking.[9]

At this meeting, each employee was again numerically scored according to the same criteria and weightings, but this time in the context of a division-wide exercise. TSM's receiving a score of 1.3 or lower were put on the list to be RIFed.[10] Plaintiff was terminated from X-Division in the RIF because he ranked at the bottom of his division with a score of 1.0[11]

Defendants assert that Plaintiff's low ranking was based primarily on the fact that he spent too much time on projects that were not funded, in the sense that there were no paying customers for the work Plaintiff was doing. These criticisms are documented in performance appraisals of Plaintiff's work for 1992, 1993, and 1995, as well as in deposition testimony of Plaintiff's supervisors.[12] Plaintiff points out that, with the exception of his two most recent evaluations, his performance appraisals at the Lab had been uniformly positive over the 22 years prior to the RIF, but that these positive evaluations were not read or considered in determining who would be laid

---

[9] Plaintiff's Response, at 4, and Exhibits C and I thereto.

[10] Exhibit C to Defendants' Memorandum, Memo Re: X-Division's Participation, Sept. 13, 1995; Exhibit 51 to Plaintiff's Response, Wersonik Deposition, at 108.

[11] Exhibits E, B, and I to Defendants' Memorandum.

[12] Defendants' Memorandum, at 4-7, and Exhibits E, F, and G thereto.

off in the RIF.  Plaintiff also points to evidence that, over the course of these years, the quality of his work and his technical skills were unquestioned by co-workers and supervisors.[13]

The 1992 evaluation did not contain any "needs improvement" ratings but did include the comment that "Bob needs to broaden the customer base for his code," because of a decline in funding.  The 1993 evaluation did contain one "needs improvement" rating; Plaintiff points out this was his first such rating in over 20 years at the Lab.  The 1995 evaluation contains three "needs improvement" ratings.  Plaintiff characterizes this 1995 evaluation as suspect, because it was completed after Plaintiff had been selected to be RIF'd, and an inference could be drawn that it was written to justify Plaintiff's selection for layoff rather than as a legitimate evaluation tool.  In addition, Plaintiff points out that the 1995 evaluation was prepared by Len Margolin, who had only recently begun to supervise Plaintiff, and the evaluation was based primarily on written comments provided by Plaintiff's former supervisor, Gary Wall.  Wall's comments were written on an employee performance evaluation form which Plaintiff alleges had been signed by Plaintiff before Wall filled it out, thus giving the false impression that Plaintiff had read the primarily negative comments but did not provide any rebuttal to them.  In addition, only the negative comments by Wall made their way into the final evaluation, whereas certain positive statements about Plaintiff were eliminated.[14]

In addition to questioning the validity of the 1995 performance appraisal, Plaintiff also points to statistical evidence which, he argues, gives rise to an inference of age discrimination.  To

---

[13] Plaintiff's Response, at 6-7, 22-23; Exhibit E to Defendants' Memorandum, Margolin Deposition, at 63; Plaintiff's Response, at 13, and Exhibits 25-29 thereto.

[14] Plaintiff's Response, at 8-9, and Exhibits 14-17 thereto; Exhibits E and G to Defendants' Memorandum.

support his argument on the pretext issue, he also cites evidence of a general labwide attitude favoring younger workers. These arguments will be examined in greater detail below, in connection with the discussion of pretext.

**II. Discussion**

    A. <u>The McDonnell Douglas analysis in an ADEA case involving a RIF</u>.

Plaintiff's claim under the ADEA that he was laid off in the course of a RIF on the basis of his age, is to be analyzed under the burden-shifting scheme of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>EEOC v. Sperry Corp.</u>, 852 F.2d 503, 507 (10th Cir. 1988); <u>Beaird v. Seagate Technology, Inc.</u>, ___ F.3d ___, 1998 WL 271563, at *5 (10th Cir. May 28, 1998).

On summary judgment, a plaintiff must first raise an issue of fact as to each of the elements of the prima facie case of age discrimination in RIF situations: (1) that plaintiff is within the protected age group; (2) that he was doing satisfactory work; (3) that he was discharged; and (4) that there is some evidence, direct or circumstantial, that the defendant intended to discriminate against him on the basis of age in reaching the RIF decision. <u>Ingels v. Thiokol Corp.</u>, 42 F.3d 616, 621 (10th Cir. 1994); <u>Branson v. Price River Coal Co.</u>, 853 F.2d 768, 770 (10th Cir. 1988). This fourth element may be established by circumstantial evidence that plaintiff was treated less favorably than younger employees during the RIF. <u>Beaird</u>, <u>supra</u>, at *5; <u>Jones v. Unisys Corp.</u>, 54 F.3d 624, 630 (10th Cir. 1995).

Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for laying off the plaintiff, at which point the plaintiff takes up the burden of raising a factual issue as to whether the employer's proffered reasons were a

pretext for discrimination. McDonnell Douglas, supra, at 802-805. "At [the summary judgment] stage, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder." Ingels, supra, at 622; Randle v. City of Aurora, 69 F.3d 441, 452 n. 17 (10th Cir. 1995).

> A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. The plaintiff need not prove the Defendant's reasons were false, or that age was the sole motivating factor in the employment decision. Rather, the plaintiff must show that age actually played a role in the Defendant's decisionmaking process and had a determinative influence on the outcome. [Internal punctuation and citations omitted].

Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994).

In a RIF case, a plaintiff can raise a pretext issue in three principal ways: (1) with evidence that his termination does not accord with the RIF criteria supposedly employed; (2) with evidence that his evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to adversely affect his termination; or (3) with evidence that the RIF itself was generally a pretext for age discrimination. Beaird, supra, at *8. Statistical evidence may be relevant to the third method. Beaird, supra, at *8, citing Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991).

The Court finds that Plaintiff has set forth a prima facie case and that Defendants have met their burden of articulating a legitimate reason for laying off Plaintiff. The Court further finds that Plaintiff has raised a genuine issue of material fact as to whether the asserted reason for Plaintiff's

7

layoff was pretextual.  The issue of pretext is appropriate for determination by the jury, and Defendants' motion for summary judgment will be denied.

    A.  Prima facie case

It is apparent that Plaintiff has stated a prima facie case, a burden which "is not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Indeed, Defendants concede for purposes of this Motion that Plaintiff has stated a prima facie case.[15]  First, Plaintiff was in the applicable age group.  Secondly, Plaintiff asserts he was performing his job satisfactorily, which is sufficient to satisfy the second element at the prima facie stage. Defendants' reasons for discharging Plaintiff are to be analyzed at point in the case where Defendants put on evidence of a legitimate nondiscriminatory reason.  MacDonald v. Eastern Wyoming Mental Health Center, 941 F.2d 1115, 1119-21 (10th Cir. 1991).  Third, Plaintiff was discharged.  As to the fourth element, Plaintiff has pointed to sufficient statistical and circumstantial evidence to make out a prima facie case that Defendant terminated him on the basis of age.  The second and fourth elements will be examined in greater detail below, in the discussion of pretext.

    B.  Assertion of a nondiscriminatory reason for the layoff

As noted above, Defendants assert budget cuts, and a general need for greater efficiency and productivity as reasons for implementing the RIF in the first place.  Plaintiff was chosen to be laid off in the RIF, Defendants say, because of his low ranking within his division.  This low ranking resulted from application of the RIF criteria to his job performance and was based on a documented assessment that Plaintiff spent too much time working on unfunded projects.

---

[15] Defendants' Memorandum, at 8.

Adverse economic conditions within a company are sufficient to state a legitimate nondiscriminatory reason for a RIF. Jones v. Unisys Corp., supra, at 631; Rea v. Martin Marietta Corp., supra, at 1455. And a termination resulting from a general company reorganization necessitated by economic conditions, in which Plaintiff is terminated because of a low performance ranking, suffices as a legitimate reason for a particular plaintiff's layoff. Schwager v. Sun Oil Co., 591 F.2d 58, 61 (10th Cir. 1979). The criteria for determining whether a worker will be terminated may contain elements of subjective judgment. Burrus v. United Telephone Co., 683 F.2d 339, 343 (10th Cir. 1982).

Plaintiff argues that the job action taken by X-Division was not really a RIF at all, because the asserted reasons for the labwide RIF, budget cuts and a need to increase TSM-to- support staff rations, did not apply to X-Division. A similar argument was rejected in Ingels v. Thiokol Corp., supra, at 622, in which the Tenth Circuit makes short shrift of the plaintiff's challenge to "the bona fide nature of the entire RIF program," noting that although the loss of some contract work by the company did not directly affect Plaintiff's department, nevertheless the defendant presented sufficient evidence that the company as a whole needed to cut positions because of the lost contract and poor economic conditions in general. As the court noted in Fallis v. Kerr-McGee Corp., 944 F.2d 743, 745 n.2 (10th Cir. 1991), the fact that "the evidence may show that Kerr-McGee was merely unable to achieve its RIF with absolute precision" does not support a finding that the RIF was unnecessary or a sham.

Defendants have thus stated a "legitimate nondiscriminatory reason" for laying off Plaintiff sufficient to rebut Plaintiff's prima facie showing. "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence

9

raises a genuine issue of fact as to whether it discriminated against the plaintiff." Colon-Sanchez v. Marsh, 733 F.2d 78, 81 (10th Cir. 1984).

    C.  Pretext

At this point, Plaintiff has the opportunity to show that Defendants' stated reason for Plaintiff's rejection was in fact pretext for a discriminatory motive. McDonnell Douglas, supra, at 804. At the summary judgment stage, the plaintiff must raise a genuine issue as to whether age was "a determining factor" in the employer's challenged decision; plaintiff need not demonstrate that age was the only factor motivating the decision. Jones v. Unisys Corp., supra, at 630, 632. As long as the plaintiff has presented evidence of pretext upon which a jury could infer discriminatory motive, the case should go to trial, as "judgments about intent are best left for trial and are within the province of the jury." Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995).

On the other hand, the plaintiff does not meet his burden by simply alleging that the facially nondiscriminatory reason was pretextual; speculation is not sufficient to make out a case for the jury. Ingels, supra, at 620. And "plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment," Branson, supra, at 772; Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). The issue is whether the plaintiff has offered sufficient evidence that a reasonable jury could find that the defendant intentionally discriminated against him. Durham v. Xerox Corp., 18 F.3d 836, 839 (10th Cir. 1994).

Plaintiff's evidence of pretext in the present case falls into three categories: (1) indications that his performance appraisals were manipulated so that he would come out badly under the RIF

10

criteria; (2) statistical evidence; and (3) indications of a labwide attitude that there was an "aging TSM problem" which needed to be corrected by hiring younger workers. Considering these assertions as a whole, factual and inferential disputes exist which must be resolved by the jury.

1. Performance appraisals

As justification for choosing Plaintiff to be laid off in the RIF, Defendants point to "needs improvement" ratings on performance evaluations for 1992, 1993 and 1995, and critical comments included in these appraisals indicating that Plaintiff was not spending enough time on funded projects, as opposed to unfunded projects that were of particular interest to him.

An employee's low ranking in an objective evaluation process does provide a facially legitimate reason for his termination, Schwager v. Sun Oil Co., supra, and "a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision." Fallis v. Kerr-McGee Corp., supra, at 747. However, necessarily subjective criteria must be applied fairly and uniformly by the employer so that employees in the protected age group are not held to unique standards not applicable to younger employees. Cole v. Ruidoso Municipal Schools, 43 F.3d 1373, 1381 (10th Cir. 1994). And where there is some real question as to the validity of the performance evaluations used in creating the rankings, this may constitute evidence of pretext. In Giacoletto v. Amax Zinc Co., Inc., 954 F.2d 424, 427 (7th Cir. 1992), the court affirmed a jury verdict in favor of the employee, noting that because the plaintiff:

> received a suspiciously negative 1985 performance evaluation just
> six days before he was fired . . . [t]he jury was entitled to conclude .
> . . that the negative evaluation for 1985 was a fabricated attempt to
> justify the forthcoming termination, and that Amax's proffered
> justification was therefore pretextual.

11

It has also been held to be a suspicious circumstance, tending to negate the employer's asserted nondiscriminatory reason for termination, when an employee "receive[s] a performance evaluation substantially less favorable than any evaluation he had previously received." Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1422 (3d Cir. 1991). While a single atypical evaluation, standing alone, may not be sufficient to support a finding of pretext, it is certainly relevant to the issue of pretext and adds weight when considered along with other factors. Colgan, supra, at 1423.

In Kirschner v. Office of the Comptroller, 973 F.2d 88, 95 (2d Cir. 1992), the court held:

> We first consider the written evaluations . . . Edward Walla, a member of the interviewing committee, testified that he did not read the reviews. In addition, the plaintiffs presented evidence indicating that the performance evaluations had been altered. In short, the jury heard evidence suggesting that the written evaluations were not accurate or even relevant to the promotion decisions, which would have allowed a reasonable jury to discount their significance.

As noted above, the negative 1995 performance evaluation was prepared at a time when Plaintiff had already been chosen to be RIFed, and the circumstances surrounding the preparation of this evaluation were therefore questionable at best. The Court agrees with Plaintiff's assertion that these circumstances, combined with the very positive evaluations of Plaintiff over the past 22 years, which were not read or considered in the course of the RIF, raise an inference that the evaluation was fabricated to justify terminating an older worker to allow younger ones to take his place. This raises a genuine issue of material fact on the question of pretext.

2. Statistics

"It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual

12

members of the class." Fallis v. Kerr-McGee Corp., supra, at 746. The statistical data must, however, be based on a large enough sample to be meaningful, and it must show a significant disparity and eliminate nondiscriminatory reasons for the disparity, meaning in part that the comparisons must be between similarly-situated groups. Fallis, at 746.

The Lab conducted a statistical analysis of the impact of the RIF on protected categories including age. The Lab's Adverse Impact Analysis shows that, for TSMs labwide, there was only a 1 in 15,023 chance that the number of over-40 workers chosen for termination in the RIF would have been as high if the decisions had been made on an age-neutral basis.[16] Plaintiff's expert conducted his own analysis of the data and concluded that, among those who were laid off in the RIF, the difference in treatment between those over 50 and those under 50 was too large to have occurred by chance. Plaintiff's expert could not render an opinion on the data from X-Division alone, as the sample was too small.[17]

This statistical evidence, standing alone, would not be sufficient to establish age discrimination. The Court would be more impressed with evidence that the performance evaluations and departmental rankings of younger, retained employees were lower than the evaluations and rankings of older, laid-off workers. See, Rea, supra, at 1456; Fallis, supra, at 746-47. However, in the present case, Plaintiff has raised a genuine issue of material fact as to the validity of the performance evaluations on which the rankings were based, and of the process that produced them. "Normally, failure to include variables will affect the analysis' probativeness,

---

[16] Exhibit 41 to Plaintiff's Response, "Adverse Impact Analysis," Sept. 13, 1995.

[17] Exhibits 42-44 to Plaintiff's Response, Letter from Everett Dillman, April 30, 1998; Dillman Deposition.

not its admissibility," Bruno v. W.B. Saunders Co., 882 F.2d 760, 766-67 (3d Cir. 1989), and this is particularly true when issues of fact exist as to the legitimacy of the variable itself.

In a case such as this, involving individual disparate treatment as opposed to disparate impact, "statistical evidence which may be helpful, though ordinarily not dispositive, need not be so finely tuned [internal punctuation and citations omitted]." Bruno, supra, at 767.

> In general, a finding of discrimination based generally on a showing of discriminatory acts and attitudes is not clearly erroneous because the district court also considered statistics that a social scientist would find insignificant.

Pitre v. Western Elec. Co., Inc., 843 F.2d 1262, 1269 (10th Cir. 1988).

The Court finds that Plaintiff's statistical evidence is relevant and tends to support a showing of pretext, particularly when combined with the additional evidence of questionable performance evaluations and evidence of a general attitude of preference for younger scientists at the Lab.

### 3. The "aging TSM problem"

Also supporting Plaintiff's contention that Defendants' stated reason for terminating him was pretextual, Plaintiff alleges a widespread attitude at Los Alamos Lab that scientists do their best work before the age of 30, and that there was a need to hire younger workers to offset the "aging TSM problem" ("TSM" standing for technical staff member).[18] Evidence of such an attitude was found to be relevant to the issue of pretext, especially when combined with other factors such as statistical evidence, in EEOC v. Sandia Corp., 639 F.2d 600, 623-624 (10th Cir. 1980):

---

[18] Exhibit C to Defendants' Memorandum, Memo Re: X-Division's Participation, Sept. 13, 1995, at 1.

> It cannot be denied that the factors of the numerous exhibits together with the direct testimony of persons having actual knowledge of Sandia's preoccupation with the "problem" of old age, have been pervasive in all of the evidence. Indeed, the decision to terminate a large percentage of the employees in 1973 gave rise to an occasion for getting rid of the old and bringing in the new.

Plaintiff has adduced the following evidence in support of his assertion of a general attitude of age bias at the Lab, which Plaintiff refers to as the "aging TSM problem." Minutes from a division meeting dated April 30, 1996 contain the notation that, "The aging TSM population is a Lab-wide problem. The Lab-wide goals are the same as the NIS goals: 50 percent of new hires at entry level and one-third women and minorities."[19] Director Hecker acknowledged that the Lab had a goal that 50 percent of new hires should be postdocs.[20] He stated further that the hiring of postdocs as permanent employees was important, as postdocs infused into the laboratory . . . a constant source of new ideas . . . That's an important part of the vitality of the institution." However, he felt it would be "reaching" to connect postdoc hiring goals to the "aging TSM" problem.[21] Ray Juzaitis stated in his deposition that one reason for X-Division's participation in the RIF was to allow him to hire more postdocs in that division.[22]

Plaintiff himself testified in his deposition that he had "heard th[e] phrase many times" that a scientist's best work is done in his thirties, and that aging TSMs were a problem. He attributed this attitude to, among others, members of the Laboratory Leadership Council, as well as to Ed

---

[19] Exhibit 36 to Plaintiff's Response.

[20] Exhibit 30 to Plaintiff's Response, Hecker Deposition, at 80-81.

[21] Exhibit 31 to Plaintiff's Response, Hecker Deposition, at 97-98.

[22] Exhibits 11, 13 to Plaintiff's Response, Juzaitis Deposition, at 109-110; Hearing Transcript.

15

Chapyak, who was at one time Plaintiff's Group Leader and who wrote performance appraisals on Plaintiff in 1992 and 1993.[23]  Plaintiff concedes, however, that it would be a legitimate concern that experienced scientists have someone to whom they can pass on their acquired knowledge, before they leave their jobs.[24]

There is substantial evidence on the record that a wide range of personnel at the Lab, from the Director on down, were concerned about the "aging TSM problem."  There are conflicting inferences which could be drawn from this evidence.  It could be seen as a legitimate business or scientific concern, or it could be seen as a euphemism for a discriminatory program of moving out older workers in order to make room for younger ones, based on an illegitimate conception that only younger workers can infuse new ideas into the Lab.  It is appropriate to let the jury decide which is the correct inference to draw.

Much of the evidence on this issue is based on comments by Lab personnel.  It is true that "stray remarks" are insufficient to establish pretext, at least to the extent they were made by nonsupervisory personnel or by those unconnected to Plaintiff's termination.  Rea, supra, at 1457.  However, while comments by supervisory employees  may not be enough standing alone to establish pretext, they may be indicative of pervasive attitudes toward older workers at the defendant company.  Cooper v. Asplundh Tree Expert Co., 836 F.2d 1544, 1548 (10th Cir. 1988) (comments included, "guys forty years old are too old to work here," and "people over forty should be fired or gotten rid of"); Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1252 (10th Cir. 1992)

---

[23] Exhibit 45 to Plaintiff's Response, Clark Deposition at 66-67; Exhibit E to Defendants' Memorandum, Clark Deposition, at 121-22, 128-34, 177; Exhibit G to Defendants' Memorandum, Performance Appraisals for Robert A. Clark.

[24] Exhibit F to Defendants' Memorandum, Clark Deposition at 105-117.

(company president commented that he would "hire a young controller").  And, as noted above, testimony of persons having knowledge of a Lab's preoccupation with the "problem" of an aging scientific staff, is probative of the issue of pretext.  EEOC v.Sandia Corp., supra.

The evidence of a labwide attitude favoring younger scientists over older ones may not convince a jury.  However, it is sufficient, when considered along with Plaintiff's other evidence, to raise an issue on the question of pretext.

### III. Conclusion

The Court finds that Defendants' Motion for Summary Judgment should be DENIED. An Order in accordance with this Memorandum Opinion will issue.

Dated at Albuquerque this 1st day of July, 1998.

                                                      BRUCE D. BLACK
                                                      United States District Judge